United States District Court
Southern District of Texas
**ENTERED**
September 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT WHITE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-870 |
| | § | |
| BASTROP ENERGY PARTNERS LP, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In February 2021, a winter storm brought Texas days of freezing weather. The Texas electric power generation grid froze as well. Throughout the state, Texans huddled in their dark homes and businesses, with no heat or running water, watching as their pipes burst and homes and businesses flooded. Litigation swiftly followed.

The issue in this multi-plaintiff, multi-defendant removed state-court action is whether the single event exclusion or the local controversy exception to the Class Action Fairness Act, 28 U.S.C. § 1332, applies. Either requires remand. Based on the motion to remand and response, the briefs, the record, the parties' arguments, and the law, the court grants the motion to remand. The reasons are set out below.

I.    **Background**

In February 2021, Winter Storm Uri caused days of below-freezing temperatures throughout Texas and other states. Texas has a separate state electrical power generation and distribution grid, directed by the Electric Reliability Council of Texas (ERCOT). The grid froze and failed to generate or deliver electricity to Texas.

In March 2021, Robert White and more than 100 individuals residing in Texas sued over 100 power generation and power transmission or distribution companies operating in and out of Texas, in state court in Harris County, Texas.  The plaintiffs alleged that they suffered "loss of life and/or … personal injuries, damages to their property and/or other losses during the February 2021 cold weather." (Docket Entry No. 1, Ex. B, ¶ 1).  They alleged that they "incurred property damages, substantial interference with the use and enjoyment of property, out of pocket losses, medical expenses in the past and future, lost wages and lost future earning capacity, extreme mental anguish and suffering, and other injuries and damages." (*Id.*, ¶ 31).  The recovery sought included actual, consequential, and punitive damages, and attorneys' fees.  (*Id.*, ¶ 80).

The plaintiffs asserted Texas state-law claims for negligence and gross negligence, breach of contract, product liability and strict liability based on an abnormally dangerous activity, fraud, negligent misrepresentation, civil conspiracy, breach of a continuing duty to warn, and breach of express and implied warranties.  All the claims arose from the alleged failure to prepare the grid for freezing temperatures and the failure to let consumers know of the potential for power interruption.

The plaintiffs identified two groups of defendants: the Power Generators, which own and operate power generation facilities and contract with the Power Distributors, and the Power Distributors, which transmit and distribute the generated power through lines that in turn deliver electricity to indirect (transmission and subtransmission) customers and then to primary and secondary customers.  (*Id.*, ¶ 2).  ERCOT, the plaintiffs alleged, does not generate or transmit power, but instead schedules and manages the flow of electricity through the grid.  (*Id.*)  The plaintiffs based this lawsuit on the Power Generators' and the Power Distributors' "individual and collective failures to implement long known and recommended measures to weatherize their power

generating facilities/stations and equipment to protect against foreseeable cold weather to avoid a catastrophe just like Texas suffered in February 2021 and because of their individual and collective operational failures during the February 2021 cold weather."  (*Id.*, ¶ 2).

The plaintiffs alleged negligence and gross negligence from the following "individual and collective" failures by both sets of defendants: to comply with safety standards, customs, and practices to weatherize facilities and equipment to prevent this kind of disaster; to supervise the facilities and equipment to make sure they were weatherized; to properly train workers to be sure they weatherized the facilities and equipment; and to protect Texans from power loss during an extreme winter storm by weatherizing.  (*Id.*, ¶ 27(a)–(d)).

The plaintiffs alleged negligence and gross negligence specifically against the Power Distributors for failing to "make all reasonable efforts to prevent interruptions of service," and to "make reasonable provisions to manage emergencies resulting from failure of service," in violation of 16 Tex. Admin. Code § 25.52.  (*Id.*, ¶ 27(e), (f)).

The plaintiffs alleged the following product and strict liability defects against the Power Generators: defective design, manufacture, assembly, inspection, and testing "from a stability and safety standpoint, so the[ facilities] would not freeze up in cold weather conditions," defects that, with defective maintenance, "failed to prepare the[ facilities] to function and provide power to consumers in cold weather conditions"; that "failed to provide a safety mechanism to prevent failure in cold weather conditions"; and that failed to "weatherize[ the facilities] to protect against cold weather conditions . . . and provide continuous electrical power."  (*Id.*, ¶ 35(a)–(e)).  The plaintiffs added alleged failures to implement government agencies' suggestions to weatherize power generation facilities, making the facilities inherently dangerous, and alleged failures to test and inspect to ensure that the facilities could "withstand and continue to produce electric power in

3

cold weather conditions." (*Id.*, ¶ 35(e), (g)). The alleged safer alternative design: "simply weatherizing." (*Id.*, ¶ 38).

As to both groups of defendants, the plaintiffs alleged strict liability based on the abnormally dangerous activity of manufacturing and supplying electricity, exposing the public and the plaintiffs to "a high degree of risk of serious injury and harm if their power generation facilities malfunctioned and/or failed to operate as occurred in February 2021." (*Id.*, ¶ 39).

The plaintiffs alleged similar breach of warranty, negligent misrepresentation, and fraud claims against both the Power Generator and the Power Distribution defendants. These allegations are based on claims that the two groups of defendants made various representations about their ability to provide electric power without mentioning that power could be interrupted during extended below-freezing temperatures. As to the fraud claims, the plaintiffs alleged that the representations were made with knowledge of their falsity and the intent to induce the plaintiffs to rely on them in receiving electric power. Similarly, the duty to warn allegations against both sets of defendants are based on the failure to warn that a long freeze could interrupt service. The fraud claims alleged that the defendants made the representations knowing they were false; the negligence claims alleged that the defendants knew or reasonably should have known that the representations were false. (*Id.*, ¶¶ 40–53).

The plaintiffs alleged a breach of a continuing duty to warn them of "potential weather-related issues that could likely affect the character and quality of the electric power they were providing and cause an interruption in service," issues that the defendants "knew, should have known, or should have discovered" because they "were the result of their design, testing, manufacturing, marketing, transmitting and/or delivering of the electric power." (*Id.*, ¶¶ 54–67). The plaintiffs also alleged breach of express and implied warranties by both sets of defendants,

4

based on "material affirmative representations," by "advertisements, pamphlets, and otherwise," that the plaintiffs "could safely and reliably use their electric power service," made when the defendants knew, or should have known that their only purpose was to provide safe and reliable electric power. (*Id.*, ¶¶ 69–78). And the plaintiffs allege that the defendants' acts and omissions amounted to a civil conspiracy.

The counts do not specify the acts or omissions, or the role of the various defendants, beyond the references to failures to "weatherize" against prolonged freezing temperatures. Whether the claims are sufficiently pleaded is the subject of a motion to dismiss, but the threshold question is whether this court has federal removal jurisdiction under CAFA. The plaintiffs have moved to remand, the defendants responded, and the plaintiffs replied. (Docket Entries Nos. 16, 24, 31). This court heard argument on the motions. Based on the pleadings, the motion and briefs, the arguments, and the applicable law, the court grants the motion to remand. The reasons are explained in detail below.

## II.     The Legal Standards

### A.     CAFA and Removal Jurisdiction

The Class Action Fairness Act of 2005 expanded federal subject matter jurisdiction over state-law class and mass actions. If there are 100 or more plaintiffs who are minimally diverse, an aggregate amount in controversy of $5 million, and a timely removal, federal removal jurisdiction is present. 28 U.S.C. § 1332(d)(2). There is no dispute here that the defendants' CAFA removal was timely and satisfied the statutory thresholds of an amount in controversy exceeding $5 million and minimal diversity. The parties agree that this is not pleaded as a class action. The remand argument centers on whether the "single event" exclusion or the "local controversy" exception to CAFA removal jurisdiction applies. Either would require remand.

The single event exclusion is a limit on the definition of a mass action removable under CAFA.  "[T]he term 'mass action' means any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact . . . ."  *Id.* § 1332(d)(11)(B)(i).  This definition is met.  But a "'mass action' shall not include any civil action in which . . . all of the claims in the action arise from *an event or occurrence* in the State in which the action was filed, and that allegedly resulted in injuries in that State . . . ."  *Id.* § 1332(d)(11)(B)(ii), (ii)(I) (emphasis added).  The Fifth Circuit refers to this provision as the "local single event exclusion."  *Rainbow Gun Club, Inc. v. Denbury Onshore, LLC*, 760 F.3d 405, 408 (5th Cir. 2014).  The dispute is whether the plaintiffs' claims arise from an "event or occurrence," a term that CAFA does not define.  *Id.* at 409.  If the claims do arise from a single event or occurrence in Texas that caused injuries in Texas, remand to the Texas state court is required.  *Id.* at 413–14.

The second is the local controversy exception, which requires a district court to "decline to exercise jurisdiction" when all of the following are true: more than two-thirds of the members of the proposed plaintiff class are citizens of the state where the action was originally filed; at least one defendant who is a citizen of that state is also a defendant "from whom significant relief is sought" and "whose alleged conduct forms a significant basis for the claims asserted by the plaintiff class"; the members of the class incurred "principal injuries" from the alleged conduct or related conduct of each defendant in the state where the action was originally filed; and no other class action asserting the same or similar allegations against the defendants has been filed in the three years before the class action at issue was filed.  28 U.S.C. 1332(d)(4)(A); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 570 (5th Cir. 2011).

A threshold issue is which side has the burden of proof with respect to the existence of, and exceptions to, CAFA jurisdiction.  The consensus is that the removing defendants must show that the case qualifies for CAFA jurisdiction; that follows the rule that the party seeking removal has the burden to show federal jurisdiction.  *See, e.g.*, *Rainbow Gun Club*, 760 F.3d at 409 n.3; *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014); *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 752 (11th Cir. 2010); *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 298 (4th Cir. 2008).  But the cases take the second step of requiring the party seeking remand on the basis of either the single event exclusion or the local controversy exception to meet the burden of proving its application.  *See Williams v. Homeland Ins. Co. of N.Y.*, 657 F.3d 287, 290 (5th Cir. 2011); *Hollinger*, 654 F.3d at 571; *Bartels by and through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 681 (4th Cir. 2018).  The defendants met their initial burden; the burden to show a lack of federal removal jurisdiction is on the plaintiffs.  *Williams*, 657 F.3d at 290; *Hollinger*, 654 F.3d at 571.

## II.     Analysis

### A.      The Definition of Mass Action: Event or Occurrence

A civil action is not a "mass action," regardless of the number of plaintiffs or defendants, if "all the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State . . . ."  28 U.S.C. § 1332(d)(11)(B)(ii).

The case law appears settled on the meaning of "event" or "occurrence" in other contexts. In *Olympic Airways v. Husain*, 540 U.S. 644 (2004), the Court looked to the dictionary definitions of an "event" to distinguish it from an "accident," deciding that an "event" is "[s]omething that happens," or "something that takes place," *id.* at 655 (internal quotations and bracket omitted), and an "occurrence" is a noteworthy "happening," or "that which comes, arrives, or happens," *id.* (internal quotations and bracket omitted); *see also Rainbow Gun Club*, 760 F.3d at 409.  The

7

circuits, however, disagree on the meaning of "event or occurrence" in the context of the mass-action definition in CAFA. Of course, the Fifth Circuit interpretation is the most important for this court.

Along with the Third and Eleventh Circuits, the Fifth Circuit interprets the phrase broadly, holding that an "event or occurrence" under the CAFA exclusion is not limited to something that happened at a discrete moment in time. *Rainbow Gun Club*, 760 F.3d at 412 (a well failure allegedly resulting from a series of negligent acts in well operation was an "event or occurrence," because "[a]lthough the exclusion certainly applies in cases in which the single event or occurrence happens at a discrete moment in time, the single event or occurrence may also be constituted by a pattern of conduct in which the pattern is consistent in leading to a single focused event that culminates in the basis of the asserted liability"); *Abraham v. St. Croix Renaissance Grp., L.L.L.P.*, 719 F.3d 270, 279–80 (3d Cir. 2013) (the emission and dispersion of pollutants over years from a single facility in the Virgin Islands onto the plaintiffs' persons and property in the Virgin Islands was an "event or occurrence" because the term is not limited to an incident with a fixed duration, such as a fire, explosion, or storm); *Spencer v. Specialty Foundry Prods. Inc.*, 953 F.3d 735, 741–44 (11th Cir. 2020) (although an occurrence or event is not limited to the defendants' actions at a single point in time, the actions must be "contextually connected and . . . culminate in one, distinct harm-causing event or occurrence," following *Rainbow Gun Club*). Circumstances that share some commonality and persist over time can be an event or occurrence for the purpose of this CAFA exclusion.

The Ninth Circuit reads "event or occurrence" more narrowly. In *Allen v. Boeing Co.*, 784 F.3d 625 (9th Cir. 2015), the court limited "event or occurrence" to local, single events with no substantial interstate effects, such as claims from local chemical spills or similar environmental

accidents.  *Id.* at 630–31.  The Ninth Circuit concluded that the exclusion did not apply to claims that one defendant released toxins into the groundwater around its facility for over 40 years, and a second defendant was negligent in its investigation and remediation for over a decade.  *Id.* at 631–34 ("[I]n the context of determining whether a legal cause of action concerns an 'event' or an 'occurrence' for purposes of CAFA, the terms most commonly and reasonably refer to a singular happening.").  The Ninth Circuit also refused to apply the exclusion to a case alleging fraud in thousands of borrower interactions that all occurred in Nevada and caused injuries in that state.  *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 668 (9th Cir. 2012) ("The 'event or occurrence' exclusion applies only where all claims arise from a *single* event or occurrence.").

Although the Ninth Circuit rejected the Third Circuit's approach in *Abraham* as too broad, it was more open to the Fifth Circuit's approach in *Rainbow Gun Club*.  In *Allen*, the Ninth Circuit allowed the exclusion when there was a single event or occurrence — like in *Rainbow Gun Club* — that produced the injuries, even though the acts underlying that failure occurred over an extended period.  *Allen*, 784 F.3d at 630, 633.  The claims arising from the pollution in *Allen*, unlike the claims in *Rainbow Gun Club*, did not arise from a single event caused by a series of related underlying acts or omissions, but rather from negligence over decades in polluting and in failing to remediate that pollution.  There was no single identifiable act in *Allen* at all.  *Id.* at 633–34.  Under *Rainbow Gun Club*, the local event or occurrence exclusion can be satisfied by contextually connected acts that occur over a period of time if those acts result in a single harm-causing event or occurrence.  Although there may be multiple acts by multiple actors, they lead to a single event or occurrence.

The allegations as to the failure of the grid during the freeze do allege a single harm-causing event or occurrence — the grid failure during the freeze — caused by actions and omissions that

occurred over years.  Under the case law in this circuit and others, neither the alleged harm nor the acts causing it are limited to something that happens in a discrete moment in time.  The issue is whether the allegations as to the defendants' actions and inactions are a sufficiently related, contextually connected "pattern of conduct" that culminated in a distinct harm, the failure of the grid.  The defendants say no: the allegations are against 100 defendants in two separate groups, one generating and one distributing electricity, each operating on its own, and all failing to weatherize the facilities or to disclose that vulnerability.  The plaintiffs say yes: the allegations that all the defendants failed to prepare their generation or distribution facilities and equipment for foreseeably subfreezing temperatures, are contextually connected acts that despite occurring over years, resulted in a single harm-causing event — the collapse of the Texas power grid in the February 2021 winter storm.

The Eleventh Circuit's opinion in *Spencer v. Specialty Foundry Products Inc.*, 953 F.3d 735 (11th Cir. 2020), is helpful in analyzing "contextually connected" events.  The plaintiffs in *Spencer* alleged that during their years working in a foundry, their employer exposed them to harmful substances.  They sued the manufacturers.  In ruling on the motion to remand under the single event carve out, the Eleventh Circuit rejected the plaintiffs' argument that the exclusion "applies to any continuing set of circumstances in a single location, regardless of when and how the harm came about."  *Id.* at 740.  As a result, allegations of a continuing tort that caused injuries within a single place was not enough.  But the circuit also rejected the defendants' argument that the exclusion applied to "only events or occurrences that take place at a singular moment in time." *Id.*  Instead, the court concluded, "'an event or occurrence' refers to a series of connected, harm-causing incidents that culminate in one event or occurrence giving rise to plaintiffs' claims." *Id.*

The fact that a large number of defendants acted separately to generate the alleged harm, the court noted, was not dispositive. *Id.* at 743.

The *Spencer* court also noted, citing *Adams v. Int'l Paper Co.*, No. 1:17-CV-105, 2017 WL 1828908, at *7 (S.D. Ala. May 5, 2017), that there were two defendants, one that allegedly caused the releases of pollutants and one that allegedly exacerbated the releases, did not preclude finding a single event. *Id.* As the court stated in *Adams*, "[t]hat defendants are alleged to have participated in that single event or occurrence in different ways does not necessitate a conclusion that there were actually multiple events or occurrences," it is enough that the acts were "collective" and "related" in triggering one harm causing event. 2017 WL 1828908, at *7. The *Adams* court remanded the case to state court. *Id.* at *8.

Similarly, in *Abraham v. St. Croix Renaissance Grp., L.L.L.P.*, the Third Circuit addressed allegations of injuries by what the court "characterized as the 'continuous release of toxic substances'" from red mud at a former refinery site, where the defendant-owner had failed to take abatement measures. 719 F.3d at 277 (citation omitted). The court rejected the defense argument that the plaintiffs' claims arose from multiple events or occurrences, because it could not "identify separate and discrete incidents causing the emission of the various substances at any precise point in time." *Id.* at 280.

Applied to this record, the defendants' argument that there were two separate sets of defendants, who allegedly acted independently and separately in failing to winterize their power generation or distribution facilities and equipment, does not preclude removal. Nor does the presence of some out of state defendants. *See, e.g.*, *Adams*, 2017 WL 1828908, at *6 (the mass tort definition was not defeated by the fact that the plaintiffs sued both papermaking and asphalt-grinding defendants, both in and out of state); *cf. Allen*, 784 F.3d at 632 ("The purpose of this

exception was to allow cases involving environmental torts such as a chemical spill to remain in state court if both the event and the injuries were truly local, even though there are some out-of-state defendants." (quoting S. Rep. No. 109–14, at 7 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 44)).   The issue is whether the defendants' admittedly separate acts were "collective" and "contextually related" in that they were "related in triggering one harm-causing event or occurrence," as needed to satisfy the exclusion.   *Spencer*, 953 F.3d at 743; *Rainbow Gun Club*, 760 F.3d at 413.

In *Spencer*, the complaint alleged continuing releases of different products the defendants made, used in the foundry in different ways, and that caused different harms.   This was not enough for remand under the single-event exclusion.   953 F.3d at 743.   First, in *Spencer*, there was no single harm-causing event, such as the well failure in *Rainbow Gun Club*.   Here, there is an allegation of a single harm-causing event: the failure of the State's electric grid during days of subfreezing winter storm conditions.   (*See* Docket Entry No. 1, Ex. B, ¶ 19).

Second, there were no allegations in *Spencer* that the defendants' acts were related in causing or triggering a single culminating event that caused the harm.   Here, by contrast, the allegations are of failures to weatherize over time by power generators and power distributors that triggered the electric grid failure when there was a winter storm that brought prolonged subfreezing temperatures.   The plaintiffs note repeated "disruptive cold weather events in 1983, 2003, 2006, 2008, 2011, and 2014" that put the defendants on notice of the need to "prepare their facilities and equipment" for freezing temperatures.   (*Id.*).   The plaintiffs also highlight reports issued in 2011 and 2014 by the Federal Energy Regulatory Commission and North American Electrical Regulatory Corporation that recommended various actions that power generators and distributors should take "prior to the onset of cold weather," "implor[ing] [them] to prepare for the winter

season with the 'same sense of urgency' and priority as they prepare for the summer peak season." (*Id.* ¶¶ 22–24 (citation omitted)).  These recommendations, "if followed[,] could have avoided entirely or substantially minimized the dire consequences of another and foreseeable winter event." (*Id.* ¶ 23).  Instead, defendants ignored the recommendations.  (*Id.* at ¶¶ 23, 24).  Due to their repeated, collective, failures to institute necessary and recommended reforms, the plaintiffs allege, the defendants were unprepared for the 2021 winter storm and unable to "supply power to consumers."  (*Id.* ¶ 20).  The result: "approximately 4.3 million power outages that affected 14.9 million Texans by putting them in the precarious position of having no power to heat and light their homes in cold weather conditions that lasted for days."  (*Id.* ¶ 19).

As the courts noted in *Spencer* and in *Adams*, the fact that more than one defendant, and even a large number of defendants, acted separately and in different ways does not show multiple events or occurrences.  *Spencer*, 953 F.3d at 743; *Adams*, 2017 WL 1828908, at *7.  Here, the plaintiffs allege — admittedly, without much detail — that the defendants' conduct "came together" to cause the overall grid to fail to provide Texans with electricity in the winter storm, because the generation and distribution facilities and equipment lacked needed protection from freezing.  (*See, e.g.*, Docket Entry No. 1, Ex. B, at ¶ 36 ("It was entirely foreseeable and well known by the Power Generators that incidents involving their facilities . . . were caused by their generation facilities' defective conditions . . . where [facilities and equipment] could and did freeze up during their normal, ordinary, and intended use."); *id.* ¶ 27(d), (f) (alleging that "the Power Transmission/Distribution Companies[] fail[ed] to 'make all reasonable efforts to prevent interruptions of service'" and "fail[ed] to 'make reasonable provisions to manage emergencies resulting from failure of service.'") (quoting 16 Tex. Admin. Code § 25.52)).  The defendants' acts that led to the failed grid need not be intentionally coordinated to be a "collective" ongoing pattern

of conduct that was "related in triggering that event or occurrence."  In *Rainbow Gun Club*, there was a "single event or occurrence" — the well failure — that "resulted from a number of individual negligent acts related to each other, all of which came together to culminate in the single event." 750 F.3d at 413.  As in *Rainbow Gun Club*, the plaintiffs' claims arose from the failure of the power grid during the freeze, a singular event, rather than from the multiple underlying acts leading up to that single focused event.

Cases similar to *Spencer*, and unlike *Rainbow Gun Club*, further support remand in this case.  In *Robertson v. Chevron USA, Inc.*, No. 15-874, 2016 WL 3667153, at *9 (E.D. La. July 11, 2016), the court refused to remand a case alleging pipe cleaning operations over 34 years by different defendants, because while the plaintiffs alleged that the operations of five defendants at various locations over three decades caused the harm, the plaintiffs did not allege any single harm-causing event from the defendants' operations.  In *Arrington v. Ana P. Hall Const., LLC*, No. 2:15-cv-711-PCH, 2016 WL 4318976 (M.D. Ala. Aug. 12, 2016), the court refused to remand a case alleging various harms to residents of an apartment complex that the defendant owners and operators allegedly failed to maintain for years.  The court emphasized that there was no culminating single event that caused the plaintiffs' harm.  Instead, their "claims arise directly from failures by the defendants to provide a wide array of maintenance services to plaintiffs in numerous different units," over an extended period.  *Id.* at *2.  And in *Addison v. Louisiana Reg'l Landfill Co.*, 398 F. Supp. 3d 4 (E.D. La. 2019), the court considered allegations of a variety of defense failures, over time, that caused a landfill to release harmful odors and chemicals over adjacent land.  Because the allegations were of ongoing improper acts and omissions relating to the design, operation, and maintenance of the landfill and systems connected to it, and did not point to "a single focused event" that was the basis of the defendants' liability, there were no "circumstances

14

that share[d] some commonality." *Id.* at 13 (quoting *Rainbow Gun Club*, 760 F.3d at 411).  The case stayed in federal court because the mass action single event exclusion did not apply.  *Id.* at 14.

Notably, the plaintiffs are not alone in viewing their claims as arising out of a single event. Many defendants have also recognized the connectedness of the alleged acts and omissions and resulting harms arising out of the grid failure, by seeking the formation of and participation in a Texas state court multi-district litigation (MDL).  (*See* Docket Entry No. 31, at 2 n.7; Docket Entry No. 31, Ex. 3, App'x A).  On April 7, 2021, ERCOT, a defendant in a separate lawsuit, moved to transfer a list of pending Texas cases to a Texas state court MDL, because "[e]ach of the cases identified . . . alleges ERCOT is liable for damages arising from a lack of electricity during Winter Storm Uri."  (Docket Entry No. 31, Ex. 3, at 1; *see also id.* at 8 ("Each case . . . arises from a singular weather event—Winter Storm Uri and the complications that the storm caused to numerous power generation facilities and distribution networks in the ERCOT Region.")).  As ERCOT noted, "[t]he cases made the basis of this Motion all allege that ERCOT and other defendants' various conduct at multiple different facilities across Texas caused the power shortages and loss of electricity that the plaintiffs experienced during Winter Storm Uri."  (*Id.* at 8).  Before filing, ERCOT "confirmed that all defendants" to "cases listed in Appendix A" were unopposed to the motion to transfer.  Those defendants include CenterPoint Energy Houston Electric, LLC, Oncor Electric Delivery Co., LLC, AEP Texas, Inc., Calpine Corp., Luminant Generation Co., Vistra Corp., Exelon Generation Co., LLC, NRG Energy, Inc., and Tenaska Gateway Partners Ltd., defendants in this case who support removal.  (*Id.*, App'x A; Docket Entry No. 31, Ex. 4; Docket Entry No. 32).  CenterPoint Energy Houston Electric LLC separately joined in ERCOT's motion to transfer to the state court MDL, because "[a]ll of the lawsuits filed against

CenterPoint Energy arise from alleged failures in the provision of electricity during Winter Storm Uri.  The storm was a single, mass disaster event that affected all plaintiffs and that forms the basis of each lawsuit," (Docket Entry No. 31, Ex. 4, at 6), and although the plaintiffs asserted "individualized facts that allegedly led to their injuries and damages," the "cases ar[o]se from the same event and share one or more common questions of fact."  (*Id.*, at 7).

The six removing defendants attempt to distinguish this case from others that might be properly transferred to a state MDL.[1]  The defendants focus on the plaintiffs' fraud claims and argue that they cannot arise out of a single event because they "arise, if at all, from many discrete instances of alleged misrepresentations or omissions that different defendants made to different parties (including the 100-plus Plaintiffs), who allegedly relied on these representations in different ways, at different times over many years."  (Docket Entry No. 24, at 13).  This argument is unpersuasive.  First, plaintiffs have alleged that all defendants omitted the same critical piece of information in communications directed to their customers: that the power grid did not have the winterizing protection needed to prevent failure from extended subfreezing temperatures.  (Docket Entry No. 1, Ex. B, ¶ 42).  Second, the pleadings do not support the argument that each plaintiff relied "in different ways" on representations about "the character and quality of the electric power" defendants could provide.  (*Id.* ¶ 49).  Texans depend on ERCOT for electricity—except perhaps those who have the ability, the means, and the awareness of the potential for electrical service interruptions from weather or other causes to install a generator.   The plaintiffs, who allege that they were left without "safe and reliable electricity," do not appear to be among the few with an alternate source of power available.  (*Id.* ¶ 4).  In short, there was no reasonable alternative course,

---

[1] Of the six removing defendants, three appear to be related entities.  (*See* Docket Entry No. 1, Ex. C-1 (listing identical service of process information for ExGen Texas Power Co., Wolf Hollow I Power, LLC, and Mountain Creek Power, LLC)).

even if the plaintiffs had been warned of the possibility of grid failure in a prolonged freeze.   Third, even if defendants made "representations in different ways, at different times over many years," an element of a fraud claim is that the plaintiff "suffer[] injury as a result" of the false representation.   *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 654 (2018).   The complaint alleged that the defendants' misrepresentations caused injury only when the plaintiffs were left without power from the same event, the power grid failure.   (Docket Entry No. 1, Ex. B, ¶ 4).   No fraud claim, or any of the plaintiffs' claims, would exist absent this single catalyzing event.   *Bonin v. Sabine River Auth. of La.*, 961 F.3d 381, 386–87 (5th Cir. 2020) ("[T]he exception requires: '*all of the claims* in the action arise from an event or occurrence in the State in which the action was filed . . . .") (quoting 28 U.S.C. § 1332(d)(11)(B)(ii)(I)).

The allegations in this case are distinguishable from those raised in other courts that have considered the single event exclusion's application to fraud claims.   In *Lafalier v. Cinnabar Serv. Co., Inc.*, No. 10-CV-0005-CVE-TLW, 2010 WL 1486900 (N.D. Okla. Apr. 13, 2010), there was "no single event or occurrence giving rise to plaintiffs' claims," when insurance companies allegedly "defraud[ed] Oklahoma residents participating in the buyout of homes" after a tornado by giving them "artificially low appraisals."   *Id.* at *1, *4.   Although the tornado was the triggering event for the plaintiffs to participate in the buyout of their homes, the alleged fraud took place after, and independent of, the tornado, and involved "numerous alleged denials or reductions of insurance claims . . . and subsequent reductions of payments . . . based on insurance claims."   *Id.* at *4.

Similarly, in *Nevada v. Bank of Am. Corp.*, 672 F.3d 661 (9th Cir. 2012), the defendant allegedly "misled Nevada consumers about the terms and operation of its home mortgage modification and foreclosure processes."   *Id.* at 664.   The Ninth Circuit held that this did "not come

17

within the 'event or occurrence' exclusion" because the case involved "widespread fraud in thousands of borrower interactions." *Id.* at 668. In these cases, the plaintiffs' fraud claims arose at different times and were not oriented around a single event. In this case, the grid failure was the triggering event for the plaintiffs' fraud claims, and the allegedly fraudulent omission of the specific potential for failure from freezing is common to all the defendants and their plaintiff customers.

The complaint in this case shows independent, but connected, defendants' actions and omissions in failing to prepare their electrical generation and distribution facilities for sustained subfreezing conditions. Those "contextually related" acts and omissions allegedly resulted in a single occurrence during the February 2021 storm—the Texas electrical power grid failure—that allegedly injured all the plaintiffs.

There is no dispute that the other requirements for a mass action are met; there is minimal diversity, there are more than 100 plaintiffs, and the amount in controversy exceeds $5 million. But because the plaintiffs' injuries all arise from a single harm-causing event, the mass-action exclusion to CAFA removal applies. Remand is required.

### B.    The Local Controversy Exception

Alternatively, even if there was no single event or occurrence, the local controversy exception would require the court to decline jurisdiction. CAFA recognizes the local controversy exception as another basis to keep "truly localized controversies" in the forum state court. *Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 338 (5th Cir. 2016) (quoting *Hollinger*, 654 F.3d at 570). The local controversy exception requires a district court to "decline to exercise jurisdiction" when: (1) more than "two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was

originally filed"; (2) there is at least one in-state defendant from whom "significant relief is sought"

and "whose alleged conduct forms a significant basis for the claims asserted" by the class; (3) the

"principal injuries resulting from the alleged conduct . . . of each defendant were incurred in the

State in which the action was originally filed"; and (4) no other class action asserting the same or

similar allegations against the defendants have been filed in the three years before the class action

at issue was filed.  28 U.S.C. § 1332(d)(4)(A).[2]

---

[2] The parties do not argue that the "local controversy" exception cannot apply to a "mass action," despite
the statute's instruction that "[a] district court shall decline to exercise jurisdiction . . . over a *class action*"
that meets the specified requirements.  *Id.* (emphasis added).  The Fifth Circuit has not addressed this issue,
but other circuits have uniformly applied the local controversy exception to class and mass actions alike.
*See, e.g.*, *Abraham*, 719 F.3d at 799–800 ("If the mass action complaint pleads neither a local-controversy
nor a home-state cause of action under subsection (d)(4) it may be removed unless the 'event or occurrence'
exclusion in subsection (d)(11)(B)(ii)(I) applies."); *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 869 (9th
Cir. 2013); *Lafalier v. State Farm Fire and Cas. Co.*, 391 F. App'x 732, 734 (10th Cir. 2010); *see also
Robertson*, No. CV-15-874, 2016 WL 3667153, at *10; *Mississippi ex rel. Hood v. Entergy Mississippi,
Inc.*, No. 3:08-CV-780-HTW-LRA, 2012 WL 3704935, at *13 (S.D. Miss. Aug. 25, 2012).  The statute's
text supports applying the local controversy exception to a mass action.  Section 1332(d)(11)(A) provides
that "[a] mass action shall be deemed a class action removable" if it meets the "provisions of [28 U.S.C. §
1332(d)(2)–(10)]."   The local controversy exception falls within these provisions.   *See* 28 U.S.C. §
1332(d)(4); *see also Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1195 (11th Cir. 2007) ("[T]he plain
language of [28 U.S.C. § 1332(d)(11)(A)] makes it clear that any 'mass action' is also considered a 'class
action' for the purposes of CAFA's removal provisions."); *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d
676, 681 (9th Cir. 2006) ("Section 1332(d) imposes a range of requirements for class action jurisdiction . .
. .  A 'mass action' must satisfy each of these requirements and processes [even though] [s]ome of these
provisions in § 1332(d)(2)-(10) . . . make no sense in the context of a mass action, which is not subject, for
example, to class certification requirements.").  As the Eleventh Circuit described the statute's "somewhat
convoluted" terminology:

> A 'mass action' is considered a 'class action' only insofar as the latter term
> is used throughout CAFA to describe those actions over which the Act
> creates expanded diversity jurisdiction.  By its own terms, the statute
> defines mass action specifically to exclude formal class actions brought
> under Fed. R. Civ. P. 23 or analogous state rules or statutes.   §
> 1332(d)(11)(B) (citing, as an exception from the 'mass action' definition,
> any 'class action' defined by 28 U.S.C. § 1711(2)).  Congress's peculiar
> drafting in this regard gives mass actions the character of a kind of
> statutory Janus; under CAFA, a mass action simultaneously *is* a class
> action (for CAFA's purposes) and *is not* a class action (in the traditional
> sense of Rule 23 and analogous state law provisions).

*Lowery*, 483 F.3d at 1195, 1195 n.27.  Following this logic, the local controversy exception applies to mass
actions despite Congress's use of the term "class action" in § 1332(d)(4).

In the Fifth Circuit, federal jurisdiction applies unless the local controversy exception is shown with "reasonable certainty." *Arbuckle Mountain Ranch of Tex., Inc.*, 810 F.3d at 338. Neither party contests that the plaintiffs are all in-state, that the principal injuries all occurred in Texas, and that no other class action has been filed against the defendants in the past three years. The removing defendants dispute that the record shows that the plaintiffs seek "significant relief" from a local defendant or that the alleged conduct of a local defendant "forms a significant basis for the claims asserted by" the plaintiffs.

As a threshold issue, the parties dispute the materials that the court may consider in determining whether the local controversy exception is met. The defendants assert that the court must confine its consideration to the pleadings, finding support in decisions from courts outside the Fifth Circuit. *See, e.g.*, *Coleman v. Estes Express Lines, Inc.*, 631 F.3d 1010, 1016–17 (9th Cir. 2011); *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009). The Ninth Circuit reasoned that the text limits a court to considering the complaint allegations as to what relief is sought, from which defendants, based on what alleged conduct. *Coleman*, 631 F.3d at 1016–17; *see also Akeem v. Dasmen Residential, LLC*, No. 19-13650, 2020 WL 508894, at *6 (E.D. La. Jan. 31, 2020) (finding "*Coleman*'s reasoning persuasive"); *Robert J. Caluda, APLC v. City of New Orleans*, 403 F. Supp. 3d 522, 537 (E.D. La. 2019) (same). The Third Circuit has not explicitly addressed whether CAFA's text forecloses examining materials outside the pleadings. In *Kaufman*, the court simply stated that "the significant basis provision effectively calls for comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants." 561 F.3d at 156. The plaintiffs rely on cases from the Eighth and Eleventh Circuits, which do allow consideration of materials outside the pleadings in determining whether the local controversy exception affects federal subject matter jurisdiction. *See, e.g.*, *Atwood v. Peterson*,

936 F.3d 835, 840–41 (8th Cir. 2019); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1167–68 (11th Cir. 2006).

The Fifth Circuit has not directly addressed this issue.  In *Hollinger*, the court stated that "[j]urisdictional determinations 'should be made largely on the basis of readily available information,'" 654 F.3d at 570 (quoting S. Rep. No. 109-14, at 44, *reprinted in* 2005 U.S.C.C.A.N. 3, 38), and cited favorably to a district court case that "ordered the defendants to produce additional evidence regarding the citizenship of the putative class" to determine whether a CAFA exception applied.  *Id.* (citing *Preston v. Tenet Healthsys. Mem'l Med. Ctr., Inc.*, 463 F. Supp. 2d 583, 592–93 (E.D. La. 2006)).  In *Cedar Lodge Plantation, LLC v. CSHV Fairway View I, LLC*, 768 F.3d 425 (5th Cir. 2015), the Fifth Circuit held that the plaintiffs could not amend their complaint to add a defendant to "trigger[] the local controversy exception and require[] the federal court to remand."  *Id.* at 426.  The circuit instructed that "courts are to look at the action when it is filed in order to determine whether the conditions for abstention are present."  *Id.* at 428.  While the opinion stated that "the local controversy exception depends on the pleadings at the time the class action is removed," the opinion did not address whether courts are permitted to examine evidence that is outside the pleadings but does not amend the complaint postremoval.  *Id.* at 429.  The Fifth Circuit's concerns about having district courts consider materials that might effectively amend complaints after removal—"forum manipulation" and over-expanding the "narrow" local controversy exception—are absent when courts consider materials not included in the pleadings that explain the pleadings but do not alter them.  *Id.* at 428–29 (emphasis omitted).

This debate need not be resolved to decide this case.   The pleadings and materials of which the court can take judicial notice, alone, demonstrate that the plaintiffs seek "significant relief" from a local defendant whose conduct forms a "significant basis" for the claims asserted.

The plaintiffs seek significant relief against in-state defendants because they seek the same relief from all defendants, at least 45 of which are in-state defendants. The plaintiffs attach to their motion to remand copies of Texas Franchise Tax Public Information Reports filed with the Texas Secretary of State. (Docket Entry No. 16, Ex. 2). The court may take judicial notice of these public documents, as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. Rule 201(b)(2); *see Hollinger*, 654 F.3d at 571–72 (taking judicial notice of "United States census data" in determining the plaintiffs' residence for the "'local controversy' and 'home state' mandatory abstention exceptions to CAFA diversity jurisdiction."). These public records establish that 45 of the defendant power generator or power distribution entities are either incorporated in, have their principal place of business in, or both, in Texas. Although the defendants do not bear any burden regarding this exception, it is notable that the removing defendants identify three out-of-state defendants in their notice of removal: the Dow Chemical Company, E.I. du Pont de Nemous and Company, and NRG Energy, Inc. (*See* Docket Entry No. 1, at 4; Docket Entry No. 1, Ex. D, at 1).

Of the circuits, the Ninth Circuit has most extensively considered the "significant relief" requirement. In *Coleman*, "the plaintiffs alleged that both the in-state defendant and the out-of-state defendant violated California law and sought damages equally from them both." *Allen v. Boeing Co.*, 821 F.3d 1111, 1119 (9th Cir. 2016) (citing *Coleman*, 631 F.3d at 1013, 1020). "This was sufficient to satisfy subsection (aa)'s requirement that plaintiffs seek 'significant relief' from the in-state defendant." *Id.* In *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111 (9th Cir. 2015), the Ninth Circuit determined that the plaintiffs had claimed "significant relief" from a local defendant when they sought "general damages, punitive damages . . . and equitable relief" against the defendant. *Id.* (quoting *Benko*, 789 F.3d at 1119). The Ninth Circuit applied these two cases

in *Allen v. Boeing*, 821 F.3d 1111 (9th Cir. 2016), finding a showing of "significant relief" even though plaintiffs did "not quantif[y] their alleged damages, but . . . specified the damages that they [sought] from each defendant. The[] damages appear[ed] to be the same whether caused by [the in-state defendant] or [the out-of-state defendant]." *Id.* at 1119. Here, as in *Allen*, the plaintiffs similarly seek the same type of damages against all defendants. (*See* Docket Entry No. 1, Ex. B., ¶ 80).

The Fifth Circuit has not addressed this issue, but it has very recently examined the home state exception to CAFA removal jurisdiction. The home state exception requires remand if "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." *Madison v. ADT, L.L.C.*, No. 21-90082, 2021 WL 3732741, at *1 (5th Cir. Aug. 24, 2021) (quoting *Hollinger*, 654 F.3d at 570; 28 U.S.C. § 1332(d)(4)(B)). Similar to the local controversy exception, the home state exception requires federal courts to "abstain from exercising jurisdiction" in order to reflect the "delicate balance between making a federal forum available to genuinely national litigation and allowing state courts to retain cases when the controversy is strongly linked to that state." *Id.* (quoting *Hollinger*, 654 F.3d at 570). In *Madison*, the court considered a class filed in state court seeking damages for breach of privacy. The plaintiffs alleged that an ADT employee who installed home security surveillance systems used his access to spy on customers in their homes. ADT intervened and removed under CAFA, and the plaintiffs moved to remand under the home state exception. *Id.*

The *Madison* plaintiffs sued the individual employee, clearly making him a "primary defendant." *Id.* The issue was whether ADT, the intervening party and a noncitizen of Texas, was also a "primary defendant" under CAFA. If not, remand was right. If so, the district court was

required to retain jurisdiction.  The district court remanded, and the circuit, on *de novo* review, reversed.  *Id.*

The Fifth Circuit relied on *Vodenichar v. Halcón Energy Props, Inc.*, 733 F.3d 497 (3rd Cir. 2013), which held that courts "should assume liability will be found and determine whether the defendant is the 'real target' of the plaintiffs' accusations."  *Id.* at *2 (quoting *Vodenichar*, 733 F.3d at 505).  This includes "determin[ing] if the plaintiffs seek to hold the defendant responsible for its own actions, as opposed to seeking to have it pay for the actions of others," and considering whether, "given the claims asserted against the defendant, it has potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable."  *Id.* (quoting *Vodenichar*, 733 F.3d at 505–06).  The *Vodenichar* court held that three defendants were primary defendants: two had been nondiverse leasing agents of the plaintiff class, while the third was a diverse oil and gas company that allegedly reneged on lease agreements.  The Third Circuit found federal jurisdiction, rejecting remand based on the home state exception.  *See Vodenichar*, 733 F.3d at 506.

The *Madison* court noted this circuit's precedents, limited as they were.  2021 WL 3732741, at *2.  In *Hollinger*, the court stated in passing (the issue of primary defendant was not in dispute) that the insurance companies were primary defendants because "all putative class members . . . have claims against the [non-diverse] County Mutuals, and as the entities that issued the insurance policies, the County Mutuals have a primary role in the alleged discrimination."  654 F.3d at 572.  In *Watson v. City of Allen*, the court considered whether three private companies, all nonforum defendants that contracted with Texas municipalities to operate challenged red light cameras, were primary defendants in a suit attempting to declare the Texas red light camera legislation unconstitutional.  821 F.3d 634, 641 (5th Cir. 2016).  Although the court noted that the

24

claims against the private companies were "expressly contingent on a threshold finding that the challenged legislative scheme [wa]s unconstitutional," the court's task was to identify the "suit's primary thrust" in order to determine the "primary defendant." *Id.* The court concluded that because the companies were not primary parties to the suit, as opposed to the state and the municipalities, the CAFA home state exception applied. *Id.*

In *Madison*, the Fifth Circuit found "much to commend the *Vodenichar* emphasis on the 'real target' of the litigation and *Watson*'s description of the controversy's 'primary thrust.'" 2021 WL 3732741, at *2. It appears that the court examined the pleading allegations to decide the issue. One relevant, but not dispositive factor, was whether ADT was alleged to be vicariously or secondarily liable. The more important factor, the court observed, was that while the two named plaintiffs "claim to represent a class of plaintiffs seeking millions in recovery for the invasion of their privacy . . . and although they had asserted claims against only the offending employee (who is imprisoned) . . . the thrust of this suit is to gain access to ADT's deep pockets, and ADT, having properly intervened, must be considered a primary defendant under CAFA." *Id.* at *2. The Fifth Circuit granted permission to appeal and reversed the remand order. *Id.*

In this case, the defendants argue that because all plaintiffs assert claims against all defendants, the court cannot tell whether the plaintiffs seek significant relief from any local defendant. (Docket Entry No. 24, at 21). If *Madison* is relevant, its approval of the *Vodenichar* approach requires this court to assume that the defendants will be held liable for their direct actions, and that given the claims asserted, at least some of the in-state defendants have "potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants" (which, for example, generated or distributed to a limited number of customers or for a short period). *Madison*, 2021 WL 3732741, at *2. Here, as in *Madison*, it is clear that the

primary thrust of this litigation is to obtain damages from all the in-state power generators and

power distributors named as defendants, as well as from the few out-of-state defendants.  The fact

that all the plaintiffs allege claims against all the defendants does not preclude the exception.  In

*Hollinger*, for example, all the plaintiff class members asserted claims against all the members of

a class of insurance company defendants, and the court found that the nondiverse defendants were

primary.  654 F.3d at 572.  Analogously, this court may find that the plaintiffs seek significant

relief from at least one of the nondiverse defendants.

The more challenging hurdle for the plaintiffs is whether there is at least one local

defendant "whose alleged conduct forms a significant basis for the claims asserted by the proposed

plaintiff class."  28 U.S.C. § 1332(d)(4)(A)(II)(bb).  "The plain text" of this provision "relates the

alleged conduct of the local defendant, on the one hand, to the claims asserted in the action, on the

other."  *Opelousas Gen. Hosp. Auth. v. FairPay Sols., Inc.*, 655 F.3d 358, 361 (5th Cir. 2011)

(quoting *Kaufman*, 561 F.3d at 156).  As the Third Circuit explained in *Kaufman v. Allstate New*

*Jersey Ins. Co.*,

> In relating the local defendant's alleged conduct to all the claims
> asserted in the action, the significant basis provision effectively calls
> for comparing the local defendant's alleged conduct to the alleged
> conduct of all the Defendants.  Indeed, all the claims asserted by the
> Plaintiffs reflect the alleged conduct of all the Defendants.  If the
> local defendant's alleged conduct is a significant part of the alleged
> conduct of all the Defendants, then the significant basis provision is
> satisfied.  Whether this condition is met requires a substantive
> analysis comparing the local defendant's alleged conduct to the
> alleged conduct of all the Defendants.

561 F.3d at 156.

It is clear from the pleadings and from public records available to the court and subject to

judicial notice that the plaintiffs allege far more than trivial or relatively minor conduct by the in-

state defendants as the basis for the damages sought.  The defendants attach portions of the Form

10-K annual reports filed by the three out-of-state defendants.  (Docket Entry No. 1, Ex. D-2, D-5, D-8).  The court can take judicial notice of the Form 10-K annual reports for other defendants.  *See Basic Cap. Mgmt, Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) ("[T]he Form 10-K" is a "publicly available government filing[] and the existence of the document[], and the contents therein, cannot reasonably be questioned.").  Judicial notice may be taken "at *any* stage of the proceeding," *id.* (emphasis in original) (quoting Fed. R. Evid. Rule 201(d)), and the court "may take judicial notice on its own," Fed. R. Evid. Rule 201(c).

One in-state defendant, CenterPoint Houston Electric, LLC (Houston Electric), is incorporated in and has its principal place of business in Texas.  (Docket Entry No. 16, Ex. 2, at 106, 107).  Houston Electric "is a transmission and distribution electric utility that operates wholly within the state of Texas."  *See* CenterPoint Energy Houston Electric, LLC, Annual Report, at 3 (Form 10-K) (Feb. 25, 2021).  "Houston Electric serves nearly all of the Houston/Galveston metropolitan area near the Texas Gulf Coast," and "[a]s of December 31, 2020, Houston Electric's customers consisted of approximately 64 [retail electric providers], which sell electricity to approximately 2.6 million metered customers in Houston Electric's certificated service area."  *Id.*  "There are no other electric transmission and distribution utilities in Houston Electric's service area."  *Id.* at 4.  During the "February 2021 Winter Storm Event," "Houston Electric implemented controlled electricity outages across its service territory, resulting in a substantial number of its customers (on certain days over a million residents) being without power, many for extended periods of time."  *Id.* at 30.  Thirty-six plaintiffs reside in Harris County and six plaintiffs reside in Galveston County, (*see* Docket Entry No. 1-21), large and heavily populated metropolitan areas serviced by Houston Electric.

Another defendant, AEP Texas, Inc., has its principal place of business in Texas.  (Docket Entry No. 16, Ex. 2, at 12).  AEP Texas "is engaged in the transmission and distribution of electric power to approximately 1,068,000 retail customers through [retail electric providers] in west, central and southern Texas."  AEP Texas, Inc., Annual Report, at 1 (Form 10-K) (Feb. 25, 2021).  "AEP's vertically integrated public utility subsidiaries hold franchises or other rights that effectively grant the exclusive ability to provide electric service in various municipalities and regions in their service areas."  *Id.* at 24.  "As a result of the February 2021 severe winter weather in Texas which caused a shortage of electric generation, ERCOT instructed AEP Texas . . . to initiate power outages . . . .  At its peak, approximately 468,000 (44%) AEP Texas customers were without power."  *Id.*  at 43.

Another defendant, Oncor Electric Delivery Company, LLC, has its principal office and place of business in Texas.  (Docket Entry No. 16, Ex. 2, at 82).  Oncor is a "regulated electricity and distribution company principally engaged in providing delivery services in the north-central, eastern, western and panhandle regions of Texas to [retail electric providers] that sell power to retail customers."  Oncor Electric Delivery Co., Annual Report, at 25 (Form 10-K) (Feb. 25, 2021). Oncor operates "wholly within Texas."  *Id.* at 11.  "From February 15 through February 17, 2021 . . . [a] significant number of homes and businesses in [Oncor's] service territory . . . experienced power outages . . . including over one million homes and businesses in [its] service territory, some for extended periods of time."  *Id.* at 14.  "The majority of Oncor's service territory is single certificated, with Oncor as the only certificated transmission and distribution provider."  *Id.* at 11.

Together, at least three defendants stated on their Form 10-K's that they are the exclusive servicers of large parts of the large state of Texas, and that during Winter Storm Uri, upwards of 400,000 to 1,000,000 of their customers were without power.  Houston Electric, for example,

28

stated that it is the only "electric transmission and distribution utilit[y]" in its "service area."  This means that those plaintiffs with claims against Houston Electric, seek relief against Houston Electric, not another, out-of-state, power distributor.  It is reasonably certain that at least many, if not most, of the plaintiffs experienced power outages that were, in part, due to the actions or inactions of these three in-state defendants and seek damages against these defendants.

This is not a case involving a "sole local defendant" amid multiple non-local defendants. *Opelousas*, 655 F.3d at 359.  In *Opelousas*, the plaintiff "allege[d] an enterprise between all three defendants" to "underpay[] Louisiana hospitals for the workers' compensation outpatient services."  *Id.* at 360, 362.  The plaintiffs alleged that one out-of-state defendant, FairPay, "review[ed] the bills from Louisiana hospitals (the plaintiff class) and calculate[d] a recommended payment below the rate required by the Louisiana Workers' Compensation Act."  *Id.* at 359–60. The other two defendants, Zurich and LEMIC, were insurance companies that "appl[ied] FairPay's recommended payment when reimbursing the plaintiff hospitals."  *Id.* at 360.  "The allegations center[ed] on the legality of FairPay's calculations of payments owed on the workers' compensation claims submitted by the plaintiff hospital," and provided no specifics regarding the insurance companies' comparative conduct.  *Id.* at 362.  It was evident to the court that FairPay was the major defendant and that, absent pleadings indicating otherwise, the sole in-state defendant was insignificant.  *See id.* at 362 ("As described by Opelousas General, FairPay is the hub of the alleged enterprise and LEMIC and Zurich are the spokes.  Fairpay submitted an affidavit stating that LEMIC is one of more tha[n] 100 insurers across the country for whom FairPay reviewed charges by Louisiana hospitals for Louisiana workers' compensation outpatient services.").  The Fifth Circuit concluded that the plaintiffs had failed to show that a local defendant's "conduct form[ed] a significant basis of the plaintiff's claims."  *Id.* at 362.

Here, there is no core out-of-state defendant whose conduct clearly "forms a significant basis of the plaintiff[s'] claims." If anything, the pleadings show the opposite. The Texas power grid is a Texas-specific grid, generating electricity for, and delivering it to, Texas consumers. The ERCOT grid is only in Texas. The plaintiffs are all in Texas. At least 45 defendants are in state. Three of those defendants are major power distributors, claiming to be the exclusive transmission and distribution provider in all, or the majority of, their service territories.

While the plaintiffs' pleadings could provide more detail on the comparative conduct of the defendants and the relief sought from specific defendants, the plaintiffs need only show that the local controversy exception applies "with reasonable certainty." *Arbuckle*, 810 F.3d at 338. This showing does not require the court to ignore common sense indications about the local nature of the controversy. In *Hollinger*, the Fifth Circuit instructed that "a common sense presumption should be utilized in determining whether citizenship requirements have been met" under the local controversy exception. 654 F.3d at 573. In *Madison* and *Opelousas*, the Fifth Circuit found, based on the pleadings, that the plaintiffs sought relief from one main out-of-state defendant despite including claims against other in-state defendants. The Sixth Circuit remarked, in determining that the local controversy exception applied to claims arising out of the contamination of drinking water in Flint, Michigan, that it would "def[y] common sense to say that a suit by Flint residents against those purportedly responsible for injuring them through their municipal water service [was] not a 'local controversy.'" *Mason v. Lockwood, Andres & Newman, P.C.*, 842 F.3d 383, 397 (6th Cir. 2016). Here, it similarly defies common sense to say that a suit by Texas residents against those purportedly responsible for injuring them through the failure of the Texas-specific electric grid is not a "local controversy."

30

The plaintiffs seek significant relief from at least one in-state defendant, whose alleged failure to winterize provided a significant basis for the power-failure injuries the plaintiffs assert. The statutory requirements for the exception are met.  Remand on the basis of the local controversy exception is required.[3]

III.     **Conclusion**

This was not an easy or obvious case.  But at the end of the day, remand is required under both the single event exclusion and the local controversy exception.  And at the end of the day, this makes sense.  Texas made its power grid state specific.  The claims arise under Texas law, on behalf of Texas plaintiffs, for the actions and omissions of a large number of Texas (and a few other) defendants, about a system designed to be a Texas system.  It is the Texas courts that should decide these claims.

SIGNED on September 21, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

_____

[3] All remaining pending motions are dismissed as moot.

31